UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>Plaintiff,<br><br>vs.<br><br>Tate's Auto Center of Winslow, Inc., et al.,<br><br>Defendants,<br><br>Linda Tate,<br><br>Relief Defendant. | CV-18-8176-PCT-DJH<br><br>Phoenix, Arizona<br>February 14, 2019<br>2:30 p.m. |

BEFORE: THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY DISPUTE HEARING

APPEARANCES:

For the Plaintiff:
Federal Trade Commission
By: KATHERINE MARY WORTHMAN, ESQ.
600 Pennsylvania Avenue NW, Mail Drop CC-10232
Washington, DC 20580

For the Defendants:
Gust Rosenfeld
By: CRAIG A. MCCARTHY, ESQ.
1 East Washington Street, Suite 1600
Phoenix, AZ 85004

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

THE CLERK: This is case number CV 18-8176, Federal Trade Commission versus Tate's Auto Center of Winslow, Inc., and others, on for discovery dispute hearing.

Counsel, would you please announce for the record, with plaintiffs going first.

MS. WORTHMAN: Hello. This is Katherine Worthman with the Federal Trade Commission.

MR. MCCARTHY: This is Craig McCarthy on behalf of defendants.

THE COURT: All right. And I know we have additional counsel on the phone as well. And I have reviewed the parties' statement of discovery dispute. And let me just ask Ms. Worthman and Mr. McCarthy -- and Ms. Worthman going first -- has there been any change in the status of the discovery dispute?

MS. WORTHMAN: No, there has not.

THE COURT: Is that correct, Mr. McCarthy?

MR. MCCARTHY: Your Honor, I guess my question would be exactly what the scope of the dispute is as we speak. We've been continuing to have meet-and-confer conference calls. I advised opposing counsel last week that we were anticipating a significant additional production of documents from our client. That occurred. We anticipate that next week by Friday at the latest we will be supplementing our discovery responses, and we will be supplementing our MIDP with regard to another 6,000 or

so documents that we did receive.

But as it relates to some items like the request for all finance transactions over a five-year period, those remain in dispute.

THE COURT: All right. Let me address the first dispute, which appears to be a request for documents, financial transactions between the periods of January 1st, 2013, and December 31st of 2018, all financial statements and advertisements.

And let me take these issues one by one, the first being the date range. And I guess, Ms. Worthman, looking at the complaint, your complaint was filed July the 31st of 2018. And was your request indeed for information, for documents going beyond your complaint date?

MS. WORTHMAN: Your Honor, we -- initially we filed the request for just the complete customer files, and we asked for it up to the date of the complaint.

THE COURT: And so this is wrong, the statement in the defendants' summary that the date extending to December 31st of 2018?

MS. WORTHMAN: Yes. And one thing we would also like to point out is that we initially served our discovery requests on November 13th, and we didn't receive any responses or objections to the discovery requests or any sort of -- you know, we requested to confer if any -- if the production of

these files was going to be greater than 1,000. And we didn't receive any responses in the time period.

And so our first argument is that the defendants have waived all of their objections to the FTC's discovery responses. And we ask that the Court order the defendants to produce the requested discovery pursuant to the Federal Rules of Civil Procedure 34 -- 33 and 34 and the Ninth Circuit case law.

You know, we requested the customer files from the date of the complaint back.

THE COURT: Well, I think in terms of any sort of waiver issue to the production of discovery or objections thereto, that actually needs to be more fully briefed. And here, though, it seems to me that there are two discrete -- one of which has subparts -- two discrete issues.

I want to get to the first discovery issue that you have outlined or, at least looking at your statements, there appears to be disagreement on.

The first question I have is at least in defendants' summary, Ms. Worthman, you are seeking for that time period of five years all financial statements; is that correct?

MS. WORTHMAN: We're seeking the customer files, finance sales, the electronic documents, the finance sales. So these are customer files that have been during -- during the five-year time period. And this is something that defendants

have produced hundreds of to the Arizona Attorney General.

And we believe that these, you know, we've asked what the burden is for producing this information. We have not been told what the cost or the burden is. We haven't been told what the size of the file is.

And we understand that it could be quite an easy production. They are not necessarily arguing burden to us, or at least they haven't in the previous meet-and-confers. They've mentioned that they just don't think that this information is relevant to our claims and defenses or their defenses.

So what we believe is that, you know, we've alleged that there is a widespread pattern of deceptive behavior. In the allegations in the complaint we cite an audit that showed that over 40 percent of Tate's applications inflated income.

We have -- In the complaint it alleges that Tate's employees altered the documents after they were signed or filled out the applications for consumers and rushed the consumers into signing this. And so these paper or electronic copies of the customer files are relevant to our allegations.

And they also are proportional. And defendants have stated that, in their MIDP disclosures, that they intend to argue that the consumers were responsible for any misrepresentations on their financing forms.

So if they're pointing to the financing forms and

saying the consumers are responsible for any misrepresentations, then these are relevant and proportional to our claims as well as the defendants' defenses.

THE COURT: Well, I understand. I've read the complaint, Ms. Worthman.

Let me turn to you, Mr. McCarthy. I did note in your summary that you stated that some of these documents have already been produced in separate suits, including to the Arizona Attorney General. And so then what has been produced and what remains outstanding in this classification of documents?

MR. MCCARTHY: Your Honor, if I can, I'll back up a bit.

With regard to, I believe, the topic we're discussing now it is essentially the request that all financed transactions, meaning sales or leases that required financing, that all of those what we call deal jackets, what the client calls a deal jacket, which is the complete file for that transaction, that all of those be produced for a five-year period.

Now, I will tell you that we've been on the phone with opposing counsel multiple times. And I can tell you that verbally we were told that the request goes through the end of last year. Whether it's July or whether it's December is probably a fairly minor issue.

What I can tell you is that our client advises that that would probably amount to at least 10,000 transactions. And we're probably talking about 23 million. I thought it was just a little over a million. But based on what additional information I got from the client today before this hearing, it could be as many as 23 million pages of documents.

I am not the most technologically savvy person in the world, but to help you understand --

THE COURT: Well, before you give me a lesson in what is in the deal jacket, let me go back to my original question.

MR. MCCARTHY: What's been produced?

THE COURT: With respect to those deal jackets for that time period, what has been produced?

MR. MCCARTHY: Okay. In their -- In their initial disclosure, the FTC identified 29 transactions by customer name that they could point to and say that they thought that for some reason it was problematic. We have produced all of those deal jackets.

We have further produced all of the deal jackets where lenders that worked with our client for whatever reason came back after the deal funded and requested additional information or wanted to, I guess you could say, audit or inquire about the transaction itself.

Regardless what the reason was, we have produced those. That's a total of 75 deal jackets. Last week we

received an additional group of deal jackets, and those relate to former employees who were involved in transactions. If those employees were disciplined or terminated by Tate's for any conduct related to the transaction itself, all of those deal jackets are going to be produced. We're in the process of getting that done. They just came in. They had to be scanned. There's a process we have to go through. But all of those are going to be produced.

Furthermore, a couple of years ago the Attorney General here in Arizona asked for some what appeared to be deal jackets for some random time periods. They seemed to be kind of, if you will, sampling with some time periods, and they asked for deal jackets. They were all produced.

Unfortunately the client did not keep a copy of the deal jackets that were produced.

So although those deal jackets still exist in the database, they didn't keep a copy of which ones were copied and produced to the Arizona Attorney General. And Tate's never heard back from the Attorney General after that information was provided.

So I can only tell you that to date we produced 75 deal jackets that are either the transactions identified by the FTC or transactions where lenders had follow-up questions, plus we will be producing another -- I don't know -- maybe 40, 50, 60 deal jackets where there were employees involved in those

transactions that were either disciplined or terminated for their own conduct having to do with the transaction. Not to say that they did the things alleged in the complaint, but if they got in trouble for anything or were terminated for anything related to their role in putting the sale together, we're producing all of those deal jackets as well.

And that's about the best I can tell Your Honor in terms of what's been produced.

THE COURT: And let -- Before I go back to the -- what appears to be the original request, let me ask Ms. Worthman: Did you, as indicated in defendants' summary, request those documents from the Attorney General, and have they responded?

MS. WORTHMAN: Yes. We've received the documents that the -- from the Attorney General, and we're not asking for a reduplication of that. But there's a large universe. I mean, we suspect that there's about 10,000 consumers that -- consumer files, but we don't know -- and this is what we've asked multiple times is -- what is the burden or cost of producing that information, seeing that they did so quickly in response to the Arizona Attorney General.

You know, they talk about pages. But with electronic files, multi-page documents can be very tiny and easily accessed and provided. And I don't understand why they -- what the claim is that it's not relevant. They haven't really stated why they believe -- why defendants believe that this is

not relevant to either our claims or their defenses.

THE COURT: Well, I guess I didn't necessarily know -- It's a little bit unclear to me still what the -- what if any hesitation there is in turning over these documents. It seems from Mr. McCarthy's statements so far they are awaiting and continuing to receive documents which they are reviewing and having to scan. And as he indicates to the Court today, those will continue to be produced. The --

MS. WORTHMAN: The --

THE COURT: Well, let me stop there. There isn't, at least at this juncture, a claim of undue burden. But as I read the broad request -- and certainly it may be stated more broadly than, Ms. Worthman, you believe. But it seems to me if you're looking for these deal jackets or all financial transactions or all financial statements, all current or former employees who handled financial transactions, that is a lot of documentation. And my sense is -- And let me ask you both, Ms. Worthman can answer my question first, and then I'll permit Mr. McCarthy -- have you two discussed sampling?

MS. WORTHMAN: Your Honor, the request for production was the customer file for every customer who purchased a vehicle with financing. So these deal jackets are the retail installment contracts. They're the contract that the consumers sign. It's not every piece of paper that might be involved in the transaction. It's the paper documentation of what the down

payment was, what the income was that the consumer stated.

In other cases they have been produced. We did in our request for production ask that the defendants confer with us before production if there were more than a thousand customer files responsive to this request.

In our multiple meet-and-confers, the defendants have refused to produce information and only have agreed to produce information for consumers that we have identified, either that we have identified as specifically complaining to the FTC, which consumer complaints are known to be just the tip of the iceberg, or are consumers where the employees had been disciplined.

THE COURT: Ms. Worthman, I'm going to stop you there because you're not responding to my question. And here's --

MS. WORTHMAN: I'm sorry, Your Honor.

THE COURT: Here's what I'm going to do, because I think both of you are stating very different scenarios. And on the one hand, Ms. Worthman, I hear you stating that the defendants are arguing that some of this documentation is irrelevant and that they are refusing to turn them over. On the other hand, I'm hearing Mr. McCarthy state that he is turning over what is being produced upon its production to him. And I haven't, in front of me, I haven't seen any statement about relevancy, undue burden, and so on.

And so in order to perfect those positions, if in fact

that is a position that the defendants want to take or if, Ms. Worthman, you think that you're entitled to every single customer in that five-year period, their financial or their deal jacket or their contract or whatever it is that you believe is relevant, I don't think your discovery dispute gets to that.

And so you're both sort of not addressing, I think, a number of things that are stated in the dispute.

And in addition to that, I want to move then to your issue of spoliation.

And what is that issue, Ms. McCarthy -- I'm sorry -- Ms. Worthman?

MS. WORTHMAN: Your Honor, we initially informed defendants that -- of the possibility of an FTC lawsuit, including a draft complaint, in January of 2018.

THE COURT: And how did you do that?

MS. WORTHMAN: With a letter and a copy of the proposed complaint stating that -- which included allegations of deceptive advertising, including copies of the advertising that are currently in the complaint.

In our document request we asked for advertisements. In the defendant's MIDP disclosures, you know, they state that the advertisements that are in the FTC's complaint are atypical, that they are not indicative of the other types of advertisements that defendants have made.

We asked for other advertisements, and they say that they don't have any.

And so, you know, they've been on notice. And in the complaint it states that we allege that there are these deceptive advertisements, and we note examples. And they don't have any documents. And so the arguments that they are going to make that it's atypical, we don't think -- we don't have anything to rebut that.

And with the spoliation, you know, as you know, parties seeking sanctions for spoliation must prove that the party had control over the evidence and had not -- had an obligation to preserve it. And we think that the letter in January of 2018 informed the defendants that the staff is prepared to recommend that the Commission file a complaint including a draft complaint.

And there's case law in the circuit that says that that is sufficient notice.

And, you know, second, the destruction or the loss was accompanied by a culpable state of mind. And the courts within the Ninth Circuit, some cite negligence, some cite gross negligence as the standard for culpable state. But in one case in particular in the District of Arizona the court found that a letter threatening litigation triggered the duty to preserve, and failing to do so amounted to gross negligence warranting sanctions.

THE COURT: All right. Mr. McCarthy --

Oh, well, let me ask first, Ms. Worthman, in terms of the advertisements that are in the complaint, where did you get those?

MS. WORTHMAN: We captured them via the Web.

THE COURT: And so --

MS. WORTHMAN: Or the Internet.

THE COURT: -- I take it you've also explored the archives of the various newspapers that run advertisements up in the northeastern part of Arizona?

MS. WORTHMAN: I mean, yes, but -- when we can definitely do that, but the fact is that the defendants have more control over knowledge of where they put those advertisements or how they disseminated them. I mean, one of the arguments that they made in their MIDP disclosures is that the ads were prepared and posted without authorization.

So it's, you know, these are Facebook advertisements. These -- They're multiple mediums that showcase these types of advertisements. And so the fact that defendants were on notice and then did not preserve documents that might be relevant to this, this is a particular instance that we know of that they didn't preserve documents.

THE COURT: And, nevertheless, Ms. Worthman, I think you do have an obligation also to sort of uncover, if there's public information out there, to do your level best to find

that in any event.

And let me turn to Mr. McCarthy then. My understanding, at least in your summary statement, is that you will attempt to acquire prior ads from your media buying vendor. And have you done that?

MR. MCCARTHY: It's in the works, Your Honor. You know, from our perspective, the difficulty here is simply that as a matter of business course, the dealerships have never maintained or preserved prior copies of ads in any medium. That's just not something they've done. They do use a media buyer, an agency, for radio and TV ads. So they're going to go get what is available through that vendor.

But my client wanted me to make clear to you that whatever we get from them will surely not be comprehensive for a five-year period. We don't know how far back they might keep clips of TV ads or files for audio that ran on the radio. But whatever they have, we're happy to produce.

But Tate has never kept copies of, in any form, ads that they've run. They just don't.

THE COURT: Well, I guess part of the concern I have, Mr. McCarthy, about that statement is in this day and age, unless it is something that is a hard copy, most things, including advertisements, are generated on the computer. And it seems to me that any sort of electronic computer forensic analysis can uncover that data even though it's been deleted.

And so I would say that because the defendants were put on notice in this January 2018 letter, that your clients are under an obligation to preserve and to determine whether or not there are traces of whatever those advertisements are in or on any computer, hard drive, thumb drive, or anything of that sort.

And I think, you know, in this day and age, there's got to be some footprint of an advertisement that your client has run --

MR. MCCARTHY: Okay. I will --

THE COURT: -- in addition --

MR. MCCARTHY: Go ahead.

THE COURT: -- in addition to inquiring of these media vendors that your client uses. And so that is what I will direct you to do.

And certainly I am concerned that if there is no trace of that evidence and we know that it's been generated on a computer in order to put it on a Facebook advertisement or something, that's going to raise a bit of an issue for your client.

So please go back to your client. Explain all of that. Tell them to do what they can to uncover whatever that -- those media advertisements are, whether or not they've been deleted or not, and produce whatever you have. And in terms --

MR. MCCARTHY: Your Honor, could I ask for clarification. Are we talking about from the time of the January 2018 letter from the FTC, or are we going back further than that?

THE COURT: The allegations in the complaint are from January, 2013, through July of -- July 31st of 2018, so within that time period.

MR. MCCARTHY: I will go back and will find out what is there and what can be recreated. The example that opposing counsel gave you with regard to an unauthorized ad, that was social networking. I believe it was Facebook posts that somebody who worked at the dealership posted. They weren't supposed to. They didn't get prior permission. It happened a couple of times according to the client. They now have a policy where the employees are not to do that.

I don't think there's much out there, but I will go back, and anything that can be recreated or can be forensically mined, whether it's a print ad or whether it is anything that was placed in another medium, we will -- we'll produce what we can find.

THE COURT: And with respect to the prior discovery dispute with regard to the consumer records, the financial statements, files related to all current or former employees, those who have been terminated, and the personnel files, I'm going to permit plaintiff to file no more than five pages of

their discovery request and how they believe the defendants are not producing and if they -- if defendants have raised any objections to that production. And then, Mr. McCarthy, you may have five pages in which to respond. And there will be no reply.

And certainly if there is a change in the discovery dispute, you will certainly let me know.

And, Ms. Worthman, when can you have that to the Court?

MS. WORTHMAN: We could file within a week from today.

THE COURT: All right. So next Thursday is your deadline for responding. And then, Mr. McCarthy, you will have under the rules in which to respond, the timeline in which to respond.

And then I will take a look at that again and see if we can resolve your discovery dispute in advance of your filing those papers or immediately upon my receiving your response.

Is there anything further from you, Ms. Worthman?

MS. WORTHMAN: No, thank you, Your Honor.

THE COURT: Mr. McCarthy?

MR. MCCARTHY: No, Your Honor. I appreciate your time.

THE COURT: Thank you. Then this matter's adjourned.

(Proceedings recessed at 3:00 p.m.)

C E R T I F I C A T E

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 26th day of March, 2019.

s/Linda Schroeder
Linda Schroeder, RDR, CRR