UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Federal Trade Commission, ) Plaintiff, ) vs. ) Tate's Auto Center of Winslow, Inc., et al., ) Defendants, ) Linda Tate, ) Relief Defendant. )

CV-18-8176-PCT-DJH

Phoenix, Arizona
April 8, 2019
3:59 p.m.

BEFORE: THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY DISPUTE HEARING

APPEARANCES:
For the Plaintiff:
Federal Trade Commission
By: NIKHIL SINGHVI, ESQ.
600 Pennsylvania Avenue NW, Mail Drop CC-10232
Washington, DC 20580

For the Defendants:
Gust Rosenfeld
By: CRAIG A. MCCARTHY, ESQ.
1 East Washington Street, Suite 1600
Phoenix, AZ 85004

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

THE CLERK: This is case number CV 18-8176, Federal Trade Commission versus Tate's Auto Center of Winslow, Inc., and others, on for telephonic discovery dispute hearing.

Counsel, will you please announce for the record with plaintiffs going first.

MR. SINGHVI: This is Nikhil Singhvi from the Federal Trade Commission.

MR. MCCARTHY: This is Craig McCarthy for the defendants Tate Auto Group defendants.

THE COURT: All right. We are here because this matter was prompted by the filing of the FTC's summary of discovery dispute that was filed with the Court on April 1st. And at that point there was not a statement included by the defendant as is required by the Court's notice of discovery dispute.

However, subsequently the defendants did file an order to show cause memorandum that was filed on the 4th -- excuse me -- the 5th of April in which it provides some additional information.

At the outset let me just ask Mr. Singhvi if he has a statement with respect to where the discovery dispute stands.

MR. SINGHVI: Thank you, Your Honor. This is Mr. Singhvi speaking. The report that we got from the defendants on Friday does not resolve the issues that we outlined on the April 1st filing. And so if the Court would

entertain argument on that, we'd like to discuss what we think the Court required and how the defendants' report falls short.

THE COURT: Yes, you may do so.

MR. SINGHVI: Okay. Well, by our reading, the Court's order to show cause covered three things, the defendants' recovery of advertisements both internally and externally; the defendants' identification of places where ads were run; and the defendants' confirmation that advisements going forward would be preserved.

On the first task, recovery, the report that we got on Friday is incomplete.

On the second task, identification, the report is satisfactory in that it actually tells us some places where the defendants placed some ads, but it's inexplicably late in a way that could harm our case.

And on the third task, confirmation, the defendants' report says nothing. And I just want to reiterate why this issue is material and why it's urgent.

It's material because the defendants admittedly did not preserve any ads after receiving the FTC's draft complaint in January, 2018.

And it appears to us that they have done little or nothing after the last time we convened with the Court except for at the end of last week.

And it's urgent, this matter is urgent because in many

instances what we have to do with the information that is coming out in drips and drabs is then chase third parties for advertisements. And we've done some of that on our own in response to some of the Court's concerns last time we spoke.

But that effort has been totally hampered by the delay in the defendants telling us which newspapers we should be contacting or which radio stations we should be contacting.

So just with that as a backdrop, I just wanted to go a little bit deeper into where we think the defects in the defendants' report lie.

First, on the recovery piece of it, which actually I think had two sub-tasks, one of which was the internal recovery efforts, that is, the defendants' searches of their own computers, and the second would be the external recovery efforts, that is, the defendants' retrieval of advertisements from their vendor.

With respect to the internal searches, the Court last time we convened asked the defendants to perform an electronic computer forensic analysis and to look for traces of advertisements in computers, hard drives, et cetera.

The report that we got on Friday does not detail any kinds of searches in any satisfactory way. For example, it does not say who performed the search. It does not say when the search was performed. Was it done in February after we last convened, or was it done last week when the Court issued

its second order?

They have not disclosed which custodians they've searched for, which pieces of equipment, whether they've searched local drives, whether they've searched network drives. Did they search e-mails? Did they go and get back-up tapes? Did they use any software tools? What search terms did they use?

We ask all these questions, because if these were simple file explorer searches by defendants' own staff, the same kind of searches that any novice user could do on his or her own computer, then we don't think that met the Court's expectations regarding a forensic analysis that would, for example, uncover deleted data or find traces of ads on various storage media. So that's why we think that the report, as far as the internal searches go, is deficient.

And then on the external search, that refers specifically to the media vendor that the defendant told us that they used. And, you know, we have, since we last convened, Your Honor, subpoenaed that vendor, DigitalWire360, and DigitalWire360 has produced advisements.

The problem there is that these were advertisements that were in defendants' possession, custody, and control all along. Rule 34 requires the defendants to have produced documents held by their agents.

In this case it appears that DigitalWire360, the

vendor, is run by the individual defendant's wife, which the defendants never told us and which the defendants didn't tell the Court.

So for the defendants to dodge our meet-and-confer questions on interrogatory six, as you may have seen in the correspondence that we put in the record at 58.1, and never tell us that, you know, DigitalWire could very easily have produced these advertisements months ago -- and it doesn't appear that, to us, that defendants reached out to DigitalWire; instead they waited and sat on their hands while the FTC had to send a subpoena there -- I think that was contrary to the Court's instruction that they were to do so. And so that's why we think that their efforts with respect to the vendor were faulty.

Turning to the second and third pieces of the Court's order to show cause, the identification of outlets and the confirmation, we do have from Friday a list of outlets where defendants have placed ads.

Frankly, we would have expected that disclosure to have occurred in December when the responses to the interrogatories were due. But now that we have them, we can try and follow up with those newspapers and those radio stations. Frankly, it comes at some cost to us and some -- and, again, delay, because this is information that we ought to have had in December. And we think that the defendants should

bear the burden of retrieving the ads from those places with two exceptions, being the Tribune and KTNN radio that the FTC stumbled upon on its own, you know, based on its own initiative.

And then on confirmation, the simplest part of this is are the defendants preserving advertisements going forward? That was in the order to show cause, and we didn't see any mention of that in the Friday report.

And so we think that there should be an order directing defendants to preserve advertisements going forward and to assign a specific custodian who is responsible for that task.

THE COURT: All right. That was quite a lengthy statement, Mr. Singhvi, and so I'm going to ask Mr. McCarthy to respond in kind taking it step by step.

With respect to, in the first instance, Mr. McCarthy, the recovery of ads, there was a discrete period of time, January 2013 through July 31st of 2018. And this goes not only to your own internal advertisements but also your vendors.

Mr. McCarthy, obviously your client was aware that DigitalWire360 is run by one of the defendants. Is that correct?

MR. MCCARTHY: It is not correct, Your Honor.

THE COURT: When did that information --

MR. MCCARTHY: DigitalWire is owned by a woman by the

name of Amy Packard, who was recently married to Richard Berry, who is one of the owners.

She has no ownership interest in the company. I only learned about that on Friday when we were having follow-up interaction with Ms. Packard with regard to their production of about 155 advertising files in response to the subpoena from the FTC, which is, as the exclusive ad buyer vendor for Tate's, we believe that that is a comprehensive, if you will, universe of the ads that are still available from the past to be produced.

But I did want you to know that had I been aware that there was a relationship between the media buyer and the company, I would have not in any way, you know, failed to disclose that or in any way hidden that. It was something I didn't learn about. But I don't know that it changes anything.

You had asked us when we last convened to not only ask the client to search internally for copies of ads -- Now remember, Your Honor, we had informed you that the client was emphatic that they never had a practice of keeping files, digitally or otherwise, of their ads, that they had relied on their media buyer to track those things and to keep them, that our clients' input was to review the material before it was produced and placed. And our client's main involvement was to negotiate pricing for the placement of the ads but that the production of the ads and the placement of the ads were not

handled by them, and they didn't keep copies.

But, nonetheless, I asked them to look everywhere that they knew to look for something that they already told me they wouldn't have. And Nick's right I don't have extremely detailed information for you about everywhere that they looked. All I can tell you is I have been told that they have looked digitally, and they have looked physically, and, as they believe, they did not maintain copies of print ads, nor did they keep digital files of the TV and radio spots that were run but that their media vendor would have those. And in fact she did, and they were produced in response to the subpoena.

And you had also indicated that we were to encourage the media buyer to be looking for those things as well.

The day that we had the conference call with you, I contacted the client and expressed that both the internal and the external efforts through the media buyer needed to be addressed immediately.

I have no reason to believe that they were not. We didn't have any direct contact here at this office with the media buyer until either last week or the week before. And that was just for us to understand what they had done and what they had found.

Some of the information that DigitalWire360 produced in response to the subpoena we've not been able to open. So we didn't understand everything that was produced because, from an

IT perspective, we had some challenges opening some of the TV and the radio spot files. Nonetheless, I can tell you as I sit here that based on what my client advises, that any existing ads that had been run through last year for the period in question that would exist would only be with DigitalWire360 and that those were produced in response to the subpoena.

THE COURT: Let me stop you there. Let me stop you there.

Were you given assurances that DigitalWire360 performed a forensic analysis of their materials?

MR. MCCARTHY: At DigitalWire360, yes, that's our understanding that that's exactly what they were doing and what they did. Much of what was produced was digital. So it would have had to have been mined through that kind of a search.

And I think we'd mentioned in the OSC statement that it took them something like 14 hours, is what the owner advised my staff, to conduct that search.

And, Your Honor, just let me take the opportunity to say that the reason that there was no defense position in the discovery dispute statement that was filed with you was an error on our part. It was drafted on the 26th. It was done on the 28th. I e-mailed Nick and told him it would be coming his way. But for some reason my secretary did not send it to Nick. And so that's why I'm sure when you saw it, you saw that we weren't even bothering to take a position, that this probably

needed to be addressed. But in fact that was not our intention, and it was not what we were doing.

THE COURT: Well, I guess let me, on that point -- and we can move on, Mr. McCarthy -- I don't take lawyer's statements that some error occurred with their secretary. This is your responsibility as a lawyer, and that send button ought to be sent by you --

MR. MCCARTHY: I was out of the office, Your Honor.

THE COURT: -- or at least --

MR. MCCARTHY: I was having --

THE COURT: -- or at least pushed.

MR. MCCARTHY: But I apologize. It's on the screen in front of me. We did it. And it essentially says what our OSC memo last week said. But again I apologize, and I take full responsibility for that.

THE COURT: Well, the other thing I would say, because I have a sense that Mr. Singhvi is, I think, concerned, as is the Court, with the respect -- with respect to the bona fide efforts of your client in uncovering what should be information kept in the course of regular business. And that is if you're going to place an advisement advertising a product, listing things such as guarantees, how is the individual such as Tate Auto going to make good on those advertisements if they don't know what the advertisement says down the road?

I mean, it seems incomprehensible to the Court that a

business owner would not preserve advertisements for a product that they are advertising for a whole lot of reasons.

And so I think the best course of action here is to have DigitalWire360 and your client submit to the Court separate affidavits detailing what they have done in terms of any sort of forensic analysis or their efforts related to uncovering prior advertisements from the dates stated, and --

MR. MCCARTHY: Your Honor, I'm happy to do that, but can I just say that the frustration on this end has been that opposing counsel seems to have an idea of how my client should do business, and --

THE COURT: Well, that's not what opposing -- No, Mr. McCarthy, that's not what opposing counsel has stated. I've stated that. And that's just based on my experience in handling some of these cases in the past.

And so I think, as I mentioned, we're going to have this ongoing question about what were the bona fide efforts of uncovering the types of advertisements that were put out there to the public.

And so to put that issue at rest, I'm going to ask that you have each of these -- the DigitalWire360 as well as your clients -- submit to the Court an affidavit stating what it is that they've done in terms of trying to find these prior advertisements.

MR. MCCARTHY: Your Honor, can I ask a clarifying

question?

THE COURT: Yes, you may.

MR. MCCARTHY: Since my client has repeatedly told me that they do not maintain these files, I think the frustration on that end is going to be how do we provide a sworn statement that we looked for things that we don't keep that we rely on our vendor to maintain? I think that's where -- I understand that you're saying that you find it hard to believe that that's the way they do things, and I don't think in any way this is a situation where they would say we don't know what's in the ads. They're involved in the content of the ads. They know where they run because they pay for them. But they simply have not maintained or housed file copies of the ads over the years. They've relied on their vendor to maintain those.

If somebody were to come to them and say, "Hey, we came in to see a vehicle, and this is the ad that we saw, and we want to know why you're not making that available," I don't think there would be any communication problem with the content of the ad and being able to navigate that.

I think this is just a matter of how this particular business handles its advertising and who is responsible for maintaining files of past ads.

I'll certainly have them do it, but my concern is that my client's going to say, you know, I mean, we'll try and detail what we've done, but we know it's not there.

THE COURT: Well, why can't they say something along the lines of the first sentence in your Page 2 of your notice?

MR. MCCARTHY: I'm sure they will. I just kind of wanted to lay a groundwork for the fact that --

THE COURT: They've searched their archives. They've searched their physical files.

MR. MCCARTHY: The archives, if you will, are the vendor's archives.

THE COURT: Well, in any event, Mr. McCarthy, specifically have your clients put down in writing in an affidavit the "everything in their power" explanation.

MR. MCCARTHY: Understood.

THE COURT: Now, with respect to identifying the media outlets, you have identified the media outlets?

MR. MCCARTHY: Correct.

THE COURT: And with the exception of the Tribune, Holbrook Tribune, and KTNN radio, I am also going to order that you make your clients make the first effort at reaching out to those newspapers, since your client sent the advertisements to them, to uncover and obtain all of the advertisements within that time period.

MR. MCCARTHY: We can do that, Your Honor. I think probably the way to do that is for us to subpoena them and then follow up and explain the situation.

THE COURT: However you feel best.

And then with respect to what you are doing for current preservation, please explain what your client is doing, Mr. McCarthy.

MR. MCCARTHY: Well, Your Honor, the client's not running any ads. As you know, they're in bankruptcy. They haven't had the money to run ads. This year my understanding is there haven't been any. There was, I think, a script back in January, but we can't find that that was ever produced or actually published anywhere.

There were a handful last year of -- I think one in October, one in December, and one about the time that the suit was filed. And we're talking to DigitalWire360 about those because we anticipate -- And the reason we know about those is there were some e-mails that reflected that there was an exchange between the vendor that does the voiceovers or does, you know -- doesn't have anything to do with producing or placing the ads but actually does the radio and TV voiceovers -- that indicated that there were a few last year.

We anticipate that we will be able to cross-reference those with what was produced by DigitalWire360 to confirm that in fact those have already been produced.

As I sit here today right now, I believe that everything that has been done since suit was filed up until the present was probably contained in the subpoena production from DigitalWire360. But we're working on corroborating that

because, again, some of those files we were not able to open.

THE COURT: And again I guess, Mr. McCarthy, I would remind you that the litigation notice was in January, 2018. And so the preservation really relates from January, 2018, forward and what was in the queue at the time.

MR. MCCARTHY: Your Honor, if I could, while we're talking about this, we have searched high and low in our documents, and we've not found a copy of that. If Nick could send us a courtesy copy of that, because that's before our involvement. And we've looked through all these files that we've got from different sources, and we've not been able to find it. So I would appreciate that.

But we do understand that the client has known about the investigation since last year, and we know that the case was filed, I think, the last day of July. We found out about it a week or so later.

And the client does understand that there are to be no ads that are run without those being preserved. It's really not a practical issue right now because they're not -- they're not running ads, and they haven't been running ads this year.

And last year there were a few. And, again, we believe that those have not only been preserved but been produced. If we find out to the contrary, we will have the vendor send those to the FTC as well.

THE COURT: All right. And so was there anything more

that you wanted to add, Mr. McCarthy?

MR. MCCARTHY: No, Your Honor. As far as we know, everything that exists has been produced. The stations, the radio stations and TV outlets, have been identified. We understand that we're to contact them and to obtain whatever files they have for prior ads, and we're responsible for preserving any ongoing ads.

And I will have both my clients and the vendor draft sworn statements for your information about what efforts were used to search archives for prior ads.

THE COURT: All right. Mr. Singhvi.

MR. SINGHVI: Your Honor, I have nothing further. I appreciate the Court's time and attention on this matter. Only one clarification. I would like, if the Court's inclined, to set some time frame by which the defendants will start their efforts to retrieve the advertisements from those other media outlets.

THE COURT: Well, given that your discovery clock has continued to run, I would say sooner rather than later, so I would say no later than 14 days --

MR. SINGHVI: Thank you.

THE COURT: -- Mr. McCarthy, unless there's some urgent reason that you need that pushed out?

MR. MCCARTHY: We'll start the process immediately, Your Honor. We'll start getting subpoena documents ready to go

for those outlets, and I don't think it's going to be 14 days before we can get subpoenas out. Then I'll follow up and contact the people at those locations where my client knows people and let them know why the subpoena's going out and what it is that we're looking for.

THE COURT: Well, then, why don't we do this. Let's put a more legal realistic time period. Let's say 30 days.

MR. MCCARTHY: I will do everything I can on my end. Obviously I can't control the turnaround for these different outlets. But on our end we can get this process started right away.

THE COURT: All right. Then if there is nothing further, then this matter's adjourned. Oh, let me --

MR. MCCARTHY: Thank you.

THE COURT: -- let me back up.

With respect to the affidavits, that should be supplied to opposing counsel and filed with the Court no later than 21 days.

MR. MCCARTHY: Yes, Your Honor.

THE COURT: All right. With that, then, we are adjourned.

MR. SINGHVI: Thank you.

(Proceedings recessed at 4:28 p.m.)

**C E R T I F I C A T E**

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of April, 2019.

s/Linda Schroeder
Linda Schroeder, RDR, CRR