**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-18-08176-PCT-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Tate's Auto Center of Winslow Incorporation, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Federal Trade Commission's (the "FTC") Motion to Exclude (Doc. 122) and its Motion for Summary Judgment (Doc. 156) against Defendants Richard Berry ("Mr. Berry") and Linda Tate ("Ms. Tate"). Defendants have filed responses to both motions (Docs. 139; 164), and the FTC has filed its replies (Docs. 141; 161). Each matter is fully briefed. The Court will address the Motion for Summary Judgment and then the Motion to Exclude.

**I.     Background**

In July 2018, The FTC filed this action against several car dealerships (collectively "Tate's Auto") and their co-owners, Mr. Berry and Ms. Tate. (Doc. 1 at ¶¶ 6–11). The Complaint alleges Defendants violated the Federal Trade Commission Act ("FTC Act"), the Truth in Lending Act ("TILA"), the Consumer Leasing Act ("CLA"), and corresponding federal regulations. (*Id.* at ¶¶ 50–69). Since then, Tate's Auto, the "Corporate Defendants," stipulated to a permanent injunction and monetary judgment with the FTC, and the Clerk of Court entered judgment accordingly. (Docs. 148; 149).

As noted in the Order granting the stipulation, Tate's Auto had filed for relief under Chapter 11 of the Bankruptcy Code in March 2019. (Doc. 148 at 2). The only remaining Defendants are Mr. Berry and Ms. Tate.

As alleged in the Complaint, Mr. Berry owned and managed Tate's Auto, which had several dealerships in northern Arizona and New Mexico. (Doc. 1 at ¶¶ 6–9). The FTC alleges these dealerships engaged in deceptive, unfair, and unlawful acts. (*Id.* at ¶ 12). Counts I and II allege Defendants inflated their consumer's financial information on the car loan applications. (*Id.* at ¶¶ 50–55). This behavior, the FTC argues, violated Section 5 of the FTC Act because Defendants misleadingly represented to consumers that they would submit accurate information to financing companies, but they would not. (*Id.*) In Counts III and IV, the FTC alleges Defendants' advertising misrepresented or failed to disclose material information, also misleading consumers in violation of Section 5 of the FTC Act. (*Id.* at ¶¶ 56–61). Count V alleges that Defendants' advertising violated the TILA by failing to include legally required credit information. (*Id.* at ¶¶ 62–65). Count VI alleges that this same failure to disclose credit information violated the CLA. (*Id.* at ¶¶ 66–69).

In its Motion for Summary Judgment, the FTC argues Mr. Berry is directly liable for these claims. (Doc. 156 at 26). It argues Mr. Berry had supervisory control over Tate's Auto's daily operations and control over the corporate bank accounts, from which he withdrew for personal benefit such as, for example, by purchasing a new Maserati and Porsche prior to his companies' bankruptcy filing. (*Id.* at 27). The FTC requests that the Court enter an injunction ordering Mr. Berry to comply with monitoring and reporting requirements designed to prevent future similar behavior. (*Id.* at 28). It also requests a monetary judgment against Mr. Berry as restitution for his allegedly unjust gain. (*Id.*) The FTC also seeks to disgorge funds from Ms. Tate as the Relief Defendant who, as alleged in Count VII, received funds from the other Defendants that were obtained through unlawful means. (Doc. 1 at ¶¶ 70–72). The FTC's Motion for Summary Judgment claims that Defendants paid Ms. Tate well over $2 million in wages from 2014

until 2018, and yet her only responsibility "was to call her sons at the dealerships and ask how their days were going." (Doc. 156 at 30).

**II. Motion for Summary Judgment**

The FTC argues that it is entitled to summary judgment on Counts I through VI of its Complaint. (Doc. 156 at 18–26). In addition, the FTC argues it is entitled to summary judgment on three issues: whether Mr. Berry is individually liable, whether injunctive relief and equitable restitution is appropriate, and whether the Court should order Ms. Tate to disgorge funds received from Tate's Auto. (*Id.* at 26–30).

*a. Legal Standard*

A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is genuine when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, a court does not weigh evidence to discern the truth of the matter; it only determines whether there is a genuine issue for trial. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994). A fact is material when identified as such by substantive law. *Anderson*, 477 U.S. at 248. Only facts that might affect the outcome of a suit under the governing law can preclude an entry of summary judgment. *Id.*

The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute. *Celotex*, 477 U.S. at 323. Once shown, the burden shifts to the non-moving party, which must sufficiently establish the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But if the non-movant identifies "evidence [that] is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations

omitted).

b. *Discussion*

1. *Counts I & II: Unfair and Deceptive Financing Practices*

The Complaint's first and second Counts allege Defendants violated Section 5(a) of the FTC Act when they inaccurately reported consumer financial information to financing companies. (Doc. 1 at ¶¶ 52, 54). Section 5 prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An unfair practice is one that is "[1] likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). "An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (cleaned up). A practice may be found deceptive based upon its "net impression." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). While proof of actual deception aids in establishing a Section 5 violation, the key inquiry is whether "a practice is likely to mislead consumers acting reasonably under the circumstances." *Id.* at 1201.

As for the unfairness of Defendants' actions, the FTC argues that consumers were injured because many defaulted on the loans, their credit rating suffered, and many were left without cars after they were repossessed. (Doc. 156 at 21). "In some cases, even after suffering repossession, these consumers still owe money on the car." (*Id.*) Furthermore, it became harder for all consumers to get a car loan. (*Id.*) "Tate's two principal financing entities during the relevant period terminated their relationships due to this misconduct. . . . This eliminated two major sources of loans available to all Tate's customers, making it less likely that their deals would get funded or that they would be funded on favorable terms." (*Id.* at 21–22). The FTC argues that consumers could not have avoided this harm because "they did not know Tate's Auto had submitted incorrect income or down payment information." (*Id.* at 22). And the FTC argues there are no

countervailing benefits to this alleged practice of falsifying information. (*Id.*) Next, the FTC alleges Defendants engaged in deceptive acts by explicitly telling consumers that they would accurately transmit their financial information to financing companies, but instead Defendants inflated the information. (*Id.* at 19). The FTC argues this misrepresentation is material because some consumers would have purchased a less expensive vehicle or forgone the purchase entirely had they known the transmitted information was inaccurate. (*Id.*)

To be clear, the alleged misrepresentation at issue here is not the false information on the loan applications. Rather, the alleged misrepresentation is what Tate's Auto *falsely told* consumers, that the information on the loan applications was true. (*Id.*)[1]

Defendants argue they "did not pursue or ignore a pattern of false representations with respect to consumer down payments or income information." (Doc. 164 at 13). They argue that the evidence shows that some "consumers were aware that down payment and/or income information was allegedly misreported, but they chose to proceed with the vehicle purchase, and, in many cases, confirmed the alleged misrepresentations to the lenders." (*Id.*) If some consumers were aware that their information was inaccurately reported to financing companies, then they were not deceptively misled and could reasonably avoid the practice. This factual issue, therefore, is material. The question, then, is whether Defendants can show that this factual dispute is genuine. *See Anderson*, 477 U.S. at 248.

Defendants argue the evidence shows Defendants' practice was not likely to mislead consumers. (Doc. 164 at 13). In support, Defendants cite eight declarations provided by the FTC, in which some declarants state they were aware their financial information was not being accurately reported. (*Id.*) Overall, the declarations show Tate's Auto regularly sent inflated customer financial information to financing companies. (Docs. 156-3; 156-4 at 1–68). Many declarants attest to feeling too rushed

---

[1] The Court notes, however, that no financing companies have made a claim against Defendants for fabricating loan applications. Two companies, Capital One Auto Finance, Inc. and Santander Consumer USA Inc., have intervened, but only for the limited purpose of moving to seal certain documents. (Docs. 152, 160).

- 5 -

through the application process to review their information. (Docs. 156-3 at 4, 38, 49, 68; 156-4 at 3, 28, 53). But other declarants admit to knowing Tate's Auto was sending creditors false information. In one declaration, for example, a customer says when she reviewed the credit application for a new car, she noticed that a Tate's Auto employee had overstated her income. (Doc. 156-3 at 86). When she told an employee of the error, the employee told her "to leave this incorrect information because that was the only way my husband and I would be able to purchase the vehicle." (*Id.*) The declarant says, "[d]espite my reservations, we signed the form because we needed a dependable vehicle." (*Id.* at 88).

Another declaration was translated from Navajo because of the declarant's limited understanding of English. (Doc. 156-4 at 52). In early January 2016, the declarant asked her niece to call Tate's Auto to ask about buying a used car. (*Id.*) Tate's Auto called back asking for the declarant's birthday and social security number. (*Id.*) An hour later, an employee called and "rapidly" said in English that she had been approved for a new Jeep Patriot. (*Id.*) The next day, a Tate's Auto employee delivered the car and "had me sign the paperwork very quickly and I did not have a chance to review it. I wrote my name on the documents in haste." (*Id.* at 52–53). Included in the paperwork was a sticky note (*Id.* at 68), on which a Tate's Auto employee "wrote down the information that he wanted me to tell the financing company." (*Id.* at 53). At that time, the declarant states her monthly was about $753. (*Id.*) The note told her to tell the financing entity that she made $3,320 per month from social security and from work as a silversmith. (*Id.*) The note also advised her to say she had made a $3,000 down payment on the car. (*Id.*) She had not made any down payment. (*Id.*) When the finance company called a week later asking, in English, to confirm the information Tate's Auto had sent, she told the employee that the "income information was correct" and she "did not correct the down payment information." (*Id.* at 54). A few days later she received a call from a Tate's Auto manager saying that the employee who sold her the car had been fired and that "the Patriot did not belong to me and that I needed to return it to Tate's." (*Id.* at 55).

Having reviewed this record, the Court must assess whether a reasonable jury could return a verdict for Defendants. *See Anderson*, 477 U.S. at 248. As the Court reviews the record, the FTC stresses that it does not need to show that consumers were *actually* deceived, only that Defendants' practice was *likely* to mislead. (Doc. 161 at 6). It is certainly possible that a jury, considering the declarant's circumstances, could find Defendants' conduct was likely to confuse and mislead consumers. And yet a jury could also reasonably infer that the consumers were not likely deceived or misled, only led astray and persuaded to participate in a lie. *See Anderson*, 477 U.S. at 255 (requiring the Court to draw all justifiable inferences in the non-movant's favor). In addition to the declarations, this conclusion would find further support from a Tate's Auto employee deposition, which claims that management directed employees to tell customers that they would need to confirm fabricated financial information when financing companies called to verify the information if they wanted their loans approved. (Doc. 157-4 at 28).

In its briefing, the FTC cites *Cyberspace.Com*, where the Ninth Circuit affirmed summary judgment for the FTC after the district court found a business's practice was likely to mislead consumers. 453 F.3d at 1202. The business in question had mailed what appeared to be checks for $3.50 to millions of consumers. *Id.* at 1198. On the back of the apparent check, in fine print, was a written offer stating that by cashing the check the consumer would agree to pay a monthly fee for internet access. *Id.* The Ninth Circuit found that "no reasonable factfinder could conclude that the solicitation was not likely to mislead consumers acting reasonably under the circumstances in a way that is material." *Id.* at 1201. The court's finding was buttressed by data showing that less than one percent of consumers who cashed the check actually attempted to use the internet service. *Id.* From this, the Ninth Circuit found it was "reasonable to infer" that 99 percent of those who cashed the check had not done so with the understanding that they were entering a contract. *Id.* Stated differently, the data showed nearly every single consumer was misled. *Id.*

Summary judgment against Defendants for Counts I and II would likely be

appropriate if there were data showing 99 percent of Tate's consumers were unaware of the inflated financing information. But the FTC's case is not benefited by any comparable evidence. Whether Tate's financing practice was likely to mislead consumers is a more complex question than whether a uniform document mailed to consumers is misleading. Viewing the evidence in Defendants' favor, as is required in the summary judgment stage, the Court cannot comfortably hold as a matter of law that the evidence shows Defendants' practice was likely to mislead or deceive consumers. *See Anderson*, 477 U.S. at 255. The FTC's Motion, with respect to Counts I and II, is denied.

### *2. Counts III & IV: Deceptive Auto Purchase and Lease Offers*

Count III and IV allege that Defendants' advertisements were deceptive and failed to disclose material aspects of their offers in violation of Section 5 of the FTC Act. (Doc. 1 at ¶¶ 56–61). Again, a deceptive act entails a material representation that is likely to mislead reasonable consumers. *Stefanchik*, 559 F.3d at 928. An advertisement "may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *Cyberspace.Com LLC*, 453 F.3d at 1200.

In its Motion for Summary Judgment, the FTC specifically details three allegedly deceptive advertisements. The first is a video commercial that, as the FTC claims, is "expressly touting '$169/MO' payments to 'purchase or lease' a Chrysler 200." (Doc. 156 at 23). The FTC alleges customers could not purchase the vehicle for that amount, making the advertisement false. (*Id.*) But the Court finds more ambiguity in the advertisement than the FTC does. In the commercial, the speaker says, "And now the 2015 Chrysler 200 can be in your driveway for only $169 per month. Plus, purchase or lease a new 2015 Chrysler and receive a brand-new iPhone 6." (Doc. 158-6 at 58, "PX 216"). The displayed text prominently highlights the rate of $169 per month and then, in a new shot, highlight the terms "purchase or lease." (*Id.*) But considered in tandem with the announcer's statement, the Court finds that it cannot determine as a matter of law that this advertisement was likely to mislead consumers. A jury could reasonably conclude

that the "purchase or lease" statement referred to the offer for a new phone.

In the second advertisement, really a set of advertisements, Defendants promoted their "Tires for Life" program.  (Doc. 156 at 24).  The FTC argues that Defendants "rarely disclosed material limitations and exclusions" associated with the offer.  (*Id.*)  For example, in a radio advertisement, the announcer says the following:

> Purchase a new vehicle from any Tate's Auto Group location and drive away with peace of mind knowing you have Tires 4 Life! That's right- Visit one of the Tate's Auto Groups state of the art service centers for 100% of the manufacturer recommended maintenance and repairs and you will receive free tire replacements for life as long as you own your vehicle. No gimmicks! Visits tatestires4life.com for full program details! Purchase a new vehicle and score tires4life!

(Doc. 158-5, at 23–24).  The FTC argues that this and other similar advertisements are "prominently offering 'free' tires with undisclosed strings attached." (Doc. 156 at 24).  But this radio advertisement does mention that a consumer would need to have service performed on their vehicle by Tate's per the manufacturer's recommendations. Other print advertisements for the program do not include the explicit offer for "free" tires. (Doc. 158-5, at 30–42).  Many of the advertisements say, "Purchase any new vehicle and get Tires 4 Life." (*See e.g., id.* at 42).  A few say that the Tires 4 Life program will provide "free tires" and to visit "tatestires4life.com for full details!" (*See e.g., id.* at 23). But the net impression of these advertisements is not plain enough for this Court say they are deceptive as a matter of law.

Finally, the FTC says Defendants' online offer to sell a vehicle for a $5,250 discount is deceptive because it hid "material terms . . . behind a fine print disclaimer, under nested nondescript hyperlinks . . . ." (Doc. 156 at 25).  The advertisement lists an "Incentive" for $5,250 and appears to subtract this amount from the truck's "MSRP" for an "Internet Price" of $35,905.  (Doc. 158-4 at 51).  There is no link indicating that the vehicle can be purchased for that price.  (*Id.*)  When one of the links is clicked, a pop-up appears titled "Request More Info."  (*Id.* at 52).  From there it is possible to click "Disclaimer(s)" which contains the details for the $5,250 "Incentive." (*Id.*)

- 9 -

The FTC compares this online interface to a website in *FTC v. Grant Connect, LLC*, where a company's website failed to adequately disclose additional products or services that the consumer would be charged for if they agreed to purchase the company's primary service. 827 F. Supp. 2d 1199, 1228 (D. Nev. 2011), *aff'd in pertinent part*, 763 F.3d 1094 (9th Cir. 2014). These disclosures were made "under the button the consumer would click on to submit payment information in step two of the ordering process, and on the terms and conditions page." *Id.* at 1228–29. The terms and conditions were located on a separate web page, and the disclosure itself was made on "paragraph 23 of dense small text." *Id.* at 1229. "Because it was hidden from view and because the step two page looked almost identical to the step one page, consumers were unlikely to see it." *Id.* The court granted summary judgment, holding that the disclosure method was misleading.

Here, the $5,250 incentive's details are located on the same page, albeit nestled two clicks away from the initial listing, not on a separate terms and conditions page. While somewhat obscure, the details are not as difficult to uncover as the disclosures in *Grant Connect*. In addition, a consumer looking to buy the truck would necessarily become aware of the actual price before making a final purchase, unlike the consumers in *Grant Connect* who could accidentally sign up for additional products without realizing what they had done. Finally, reasonable consumers viewing the webpage could conceivably understand that they would not necessarily qualify for the incentive or pay the "Internet Price." In total, the Court cannot say that Defendants' advertisements violate the FTC Act as a matter of law, and it will deny the FTC's Motion for Summary Judgment with respect to Counts III and IV. The Court notes here that it declines to enter summary judgment on any of the FTC's FTC Act claims.

### 3. Counts V & VI: Violations of the TILA and CLA

The FTC alleges that some of Defendants' advertisements also violate the TILA, CLA, and accompanying federal regulations. (Doc. 1 at ¶¶ 62–69). It argues the advertisements fail to include required payment information and additional terms in a

clear and conspicuous way. (Doc. 156 at 25–26). Defendants argue that, by categorically alleging some advertisements violated the TILA or CLA, the FTC has not met "its burden to specifically address and substantively prove that each was in violation of TILA or CLA." (Doc. 164 at 17). At the summary judgment stage, the moving party's burden is to identify parts of the record showing there is no genuine dispute of material facts. *Celotex*, 477 U.S. at 323. The FTC has identified several advertisements that state down payments but fail to include other required information. (*See e.g.,* Docs. 157-3, at 4; 158-5 at 6, 8, 19–23, 35, 51–57; 158-6 at 11–18, 21–24). Upon review, these advertisements are missing legally required information such as the terms of repayment or the annual percentage rate. *See* 15 U.S.C. §§ 1664(d), 1667c; 12 C.F.R. §§ 213.7, 226.24(d). The burden has shifted to Defendants to show the facts are in dispute. *See Matsushita*, 475 U.S. at 585–86. Having failed to carry this burden, the Court will grant summary judgment for the FTC as to Counts V and VI.

### *4. Mr. Berry's Liability*

The FTC argues Mr. Berry is individually liable for its claims and subject to injunctive relief and equitable restitution. (Doc. 156 at 26–27). Its briefing focuses solely on individual liability pursuant to the FTC Act. (*Id.*) For injunctive relief under the FTC Act against an individual, the FTC must prove that the corporation actually made misrepresentations to consumers. *Publ'g Clearing House, Inc.*, 104 F.3d at 1171. Likewise, holding an individual liable for equitable restitution requires showing that an individual had knowledge of misrepresentations. *Id.* Given that the Court finds genuine issues of fact on the FTC Act claims in Counts I–IV with regards to whether consumers were likely misled or deceived, it is premature to address whether Mr. Berry may be held liable for those claims as a matter of law.

The parties have not argued whether Mr. Berry may be held individually liable under the TILA or CLA. Therefore, the Court declines to rule on that issue.

### *5. Requested Relief and Disgorgement*

The FTC requests the Court enter judgment by granting various forms of relief and

ordering Ms. Tate to disgorge money that she derived from allegedly unlawful activities. (Doc. 156 at 29–30). Under Federal Rule of Civil Procedure 54(b), a Court may enter final judgment on fewer than all the claims when it "determines that there is no just reason for delay." In this instance, the Court finds there is reason to delay entering judgment. The Court has not granted summary judgment on the FTC Act claims, and it has not found Mr. Berry may be individually liable for Counts V and VI. Entering judgment would be inappropriate with important and unresolved factual issues.

### III. Motion to Exclude

Defendants' expert witness, Mr. Christopher Linscott, conducted an analysis of "transaction activity for [Tate's Auto] as maintained in their CDK accounting system for the period 2013 through March 9, 2019." (Doc. 122-1 at 3). The FTC objects to some of Mr. Linscott's written conclusions and moves to exclude them. (Doc. 122 at 2).

#### a. Legal Standard

Federal Rule of Evidence 702 allows qualified experts to present their opinions if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." An admissible expert opinion uses specialized knowledge in combination with reliable principles and methods of analysis. Fed. R. Evid. 702(c); *Daubert v. Merrell Dow Pharm., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). The opinion must also be helpful and "relevant to the task at hand." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). A helpful, relevant opinion "logically advances a material aspect of the proposing party's case." *Id.*

Courts may admit an expert opinion even when it touches on ultimate issues to be decided by a jury. Fed. R. Evid. 704(a); *United States v. Rogers*, 769 F.2d 1418, 1425 (9th Cir. 1985). However, an expert's personal opinion and unsupported speculation is not admissible. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014). In addition, expert witnesses cannot give their opinions on legal conclusions as that would encroach on the trial judge's domain. *Nationwide Transp. Fin. v. Cass Info.*

*Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

    b. *Discussion*

The FTC does not contest whether Mr. Linscott is qualified as an expert or whether his methodology was flawed. (Doc. 141 at 2). Under its gatekeeping function the Court has reviewed Mr. Linscott's resume, (Doc. 122-1 at 14–16), and finds he is a qualified expert accountant. *See* Fed. R. Evid. 702. However, the FTC argues Mr. Linscott oversteps his bounds as an expert by presenting opinions that are speculative, legal conclusions, and irrelevant. (Doc. 122 at 2). Defendants argue that the opinion is admissible and relevant to questions of liability and damages. (Doc. 139 at 2). The FTC contests two general areas of the opinion: Whether Tate's Auto's funds earned by allegedly illegal activity can be traced to Mr. Berry and Ms. Tate, and whether those funds are "problematic." (Doc. 122 at 4, 7).

    1. *The Traceability of Ill-gotten Monies*

Mr. Linscott opines "[t]here is no evidence to support that funds received by [Ms.] Tate or [Mr.] Berry can be traced to any alleged ill-gotten monies." (Doc. 122-1 at 2). He supports this statement as follows:

> Based on the evidence that has been provided by the FTC, there has been no adjudication of any specific customers where [Tate's Auto] allegedly received ill-gotten monies. As a result, there is no evidence that any specific ill-gotten funds can be traced to monies received by [Mr.] Berry or [Ms.] Tate or whether those funds went to buy inventory or pay operating expenses of the business.

(*Id.* at 4). Finally, Mr. Linscott asserts that because both Mr. Berry and Ms. Tate "lent significant funds to [Tate's Auto] . . . there is a realistic possibility that the funds paid to [Mr.] Berry and [Ms.] Tate were from loan proceeds not alleged ill-gotten monies." (*Id.*)

The FTC argues that Mr. Linscott engages in unwarranted speculation by opining, first, that the allegedly ill-gotten monies could have been spent elsewhere and, second, that the money Mr. Berry and Ms. Tate received may have been legitimate loan repayments. (Doc. 122 at 5–6). A speculative statement is one that lacks an

understandable technical basis. *Daubert II*, 43 F.3d at 1319. Mr. Linscott does not assert that the allegedly ill-gotten funds went towards Tate's Auto's operating expenses. That would be a baseless opinion. Instead, based on his review, he opines that there is no way to discern where the funds went. Likewise, he does not assert that the money Mr. Berry and Ms. Tate received were from loan proceeds, only that the data he reviewed do not foreclose this possibility. Mr. Linscott's opinion explains what the data he reviewed do and do not show, and this is not speculative.

The FTC also argues this opinion is a legal conclusion because Mr. Linscott himself "concludes that neither [Mr.] Berry nor [Ms.] Tate received illegally obtained funds." (Doc. 122 at 5). At times, Mr. Linscott's writing could be interpreted as reaching legal conclusions, such as that the FTC failed to produce any evidence showing traceability. For example, Mr. Linscott asserts that "no evidence" demonstrates traceability. (Doc. 122-1 at 2). Read alone, that particular sentence is misleading because it implies Mr. Linscott has reviewed all the evidence when he has not. Mr. Linscott's list of documents used in his analysis (*Id.* at 11–12) does not include, for example, Ms. Tate's responses to interrogatories or her deposition. (*See e.g.,* Docs. 156-6 at 64–70; 157-1 at 2–17). Of course, the Court will not permit Mr. Linscott to opine on evidence he has not reviewed. *See* Fed. R. Evid. 703 (stating that an expert may base an opinion on facts or data that he has been made aware of). But reading the opinion as a whole, it seems clear to the Court that Mr. Linscott only bases his opinions on the documents he has reviewed. His statement that "no evidence" shows traceability is not so expansive as to become a legal conclusion.

Similarly, one could interpret a legal conclusion in Mr. Linscott's opinion when he says "there has been no *adjudication* of any specific customers where [Tate's Auto] allegedly received ill-gotten monies." (Doc. 122-1 at 4) (emphasis added). Mr. Linscott could mean ill-gotten monies are not traceable in the data he reviewed simply because no court has held the monies were ill-gotten. If that is what he means, then his opinion regarding the traceability of funds is not admissible. Expert opinions must help the jury.

Fed. R. Evid. 702(a). It is not helpful for Mr. Linscott to imply that ill-gotten monies cannot be traced because there are no ill-gotten monies. Furthermore, if this statement is predicated upon the assumption that there are no ill-gotten monies, this is an implicit and circular legal conclusion, which the Court will not admit. However, if Mr. Linscott means to say that the data he reviewed do not differentiate between allegedly ill-gotten funds and those obtained legally, the Court finds no impermissible legal conclusion.

In any event, the FTC argues that this opinion is legally irrelevant. (Doc. 122 at 5). To be relevant, expert opinions must "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. Defendants argue that the point of Mr. Linscott's analysis here is to show that Mr. Berry, upon reviewing the accounting information, would not have been able to recognize, solely based on a review of the financial information, any illegal activity. (Doc. 139 at 10). Establishing individual liability for equitable restitution under the FTC Act requires proving an individual had knowledge of the dishonest conduct. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). In this regard, Mr. Linscott's opinion is relevant to Defendants' claim.

The FTC acknowledges that whether Mr. Berry had knowledge of the deceptive conduct is a material issue, but it argues that other facts "easily" establish the knowledge requirement. (Doc. 141 at 6). It may be that the FTC's evidence is significantly more compelling that Mr. Linscott's opinion. However, relevancy here depends on whether Mr. Linscott's opinion logically advances the position that Mr. Berry was unaware of illegal activity. *See Daubert II*, 43 F.3d at 1315. The opinion supports Defendants' position that a person reviewing the financial data would not necessarily be alerted to illegal activity, and it is therefore relevant. Mr. Linscott may testify to that effect because it advances Defendants' position.

Defendants also argue Mr. Linscott's testimony is relevant to establish Ms. Tate had a legitimate claim to funds she received from Tate's Auto. (Doc. 139 at 11). The FTC seeks to disgorge those funds, which is a proper remedy when a relief defendant

possesses illegally obtained profits and to which the relief defendant has no legitimate claim. *See SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("[P]laintiff must show that the nominal defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds."); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1009 (N.D. Cal. 2010) (applying *Colello's* test to FTC Act Section 5 claims), *aff'd*, 475 F. App'x 106 (9th Cir. 2012). The FTC acknowledges that whether Ms. Tate had a legitimate claim to the funds is a material issue. (Doc. 141 at 8). Testimony that the financial data do not preclude the possibility of legitimate claims is therefore relevant. Mr. Linscott may testify to this opinion.

### 2. *"Problematic" Monies Paid to Mr. Berry or Ms. Tate*

Mr. Linscott's second opinion at issue is, according to the data he reviewed, Tate's Auto "had positive equity through at least December 31, 2016. Any monies paid to [Ms.] Tate or [Mr.] Berry that were classified as draws would not be problematic through at least 2016 as these were retained profits of [Tate's Auto] and there would be no potential detriment to creditors as a result of those disbursements." (Doc. 122-1 at 4).

As above, the parties' disagreement is really a question of interpretation. The FTC reads Mr. Linscott's opinion as an impermissible legal conclusion, implying that the money she received was legitimate because it was not "problematic." (Doc. 122 at 7). Defendants interpret the term "problematic" as one that refers to "standards within the accounting and financial fields." (Doc. 139 at 14–15). They argue the statement is not a legal evaluation but, rather, an "analysis of solvency and owners' equity available for distribution through at least 2016." (*Id.* at 15). The Court finds no impermissible legal conclusion with Defendants' interpretation.

Regardless of how one reads the opinion, the FTC argues it is legally irrelevant. (Doc. 122 at 8). For Ms. Tate, the Relief Defendant, whether she has a legitimate claim to the funds she received from Tate's Auto is indeed an issue. *See Colello*, 139 F.3d at 677. An accountant's review of financial documents to determine whether there are any accounting problems in the draws Ms. Tate received is relevant because it advances

Defendants' position that Ms. Tate had a legitimate claim to the funds. *See Daubert II*, 43 F.3d at 1315. Therefore, to the extent that Mr. Linscott's analysis advances this position, it is admissible.

For Mr. Berry, however, whether funds he received came from a legitimate source is not an issue. His liability depends on whether he had knowledge of the alleged illegal behavior. *Network Servs. Depot, Inc.*, 617 F.3d at 1138 (quoting *Publ'g Clearing House, Inc.*, 104 F.3d at 1170). Therefore, Mr. Linscott may not offer his analysis of solvency and equity for the purpose of showing that Mr. Berry had a legitimate claim to the funds. This includes Mr. Linscott's statement that Mr. "Berry lent $856,181 to [Tate's Auto] in 2018, and he was not repaid on these loans. This amount is in excess of the total draws received by [Mr.] Berry during the 2013 through March 2019 period analyzed." (Doc. 122-1 at 2, 5). To the extent that this statement demonstrates a legitimate claim to the draws Mr. Berry received, it is irrelevant to the issue of Mr. Berry's liability and is therefore inadmissible.

Finally, the FTC argues that Mr. Linscott "does not provide any expert accounting analysis showing that Tate did not receive profits from entities engaged in wrongdoing, nor does he prove that she had a legitimate claim to such profits." (Doc. 122 at 8). But this is not the point of Mr. Linscott's opinion. The point is to show that the documents he reviewed do not conclusively show illegal activity. Furthermore, it is the FTC's burden to show Ms. Tate received ill-gotten monies to which she had no legitimate claim. *See Colello*, 139 F.3d at 677.

The Court will grant the FTC's Motion to Exclude in part and deny it in part. Mr. Linscott may not opine on evidence he has not reviewed. He may opine that, based solely on the evidence he reviewed, nothing in the financial data would alert Mr. Berry to any alleged illegal activity. Mr. Linscott may also opine that the financial data he reviewed do not preclude the possibility that Ms. Tate had a legitimate claim to the funds she received, but he may not opine that Mr. Berry may have had a legitimate claim.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 156) (with a redacted copy at Doc. 132) is **granted** only as it relates to Counts V and VI of the Complaint. The remainder of the Motion is **denied** as detailed in Section II.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude (Doc. 122) is **granted** in part and **denied** in part as detailed in Section III.

**IT IS FINALLY ORDERED** that in light of the partial denial of the Motion for Summary Judgment, the parties are directed to comply with Paragraph 11 of the Rule 16 Scheduling Order (Doc. 24) regarding notice of readiness for pretrial conference.

Dated this 5th day of February, 2021.

Honorable Diane J. Humetewa
United States District Judge